E-FILED
Thursday, 11 March, 2021 03:12:37 PM
Clerk, U.S. District Court, ILCD

**SEALED**

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

FEB 2 2 2021

for the

Central District of Illinois

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
ONE BLACK COLORED IPHONE, AND
ONE BLACK COLORED IPHONE, MODEL: A1660

CURRENTLY LOCATED AT THE DRUG ENFORCEMENT
ADMINISTRATION NON-DRUG EVIDENCE ROOM

Case No. 21-MJ- 3020

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### SEE ATTACHMENT A

located in the _____ Central _____ District of _____ Illinois _____, there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | Conspiracy and possession with the intent to distribute a controlled substance |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/ Todd Emery

*Applicant's signature*

SA Todd Emery, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

*(specify reliable electronic means).*

s/ Tom Schanzle-Haskins

Date: 03/22/2021

*Judge's signature*

City and state: Springfield, Illinois

Tom Schanzle-Haskins, United States Magistrate Judge

*Printed name and title*



**SEALED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**



FEB **2 2** 2021

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| ONE BLACK COLORED IPHONE AND ONE BLACK COLORED IPHONE, MODEL: A1660 | Case No. 21-MJ-3020 |
| CURRENTLY LOCATED AT THE DRUG ENFORCEMENT ADMINISTRATION NON-DRUG EVIDENCE ROOM | **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Todd M. Emery, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration and have been so employed for more than nine years. I have had extensive training in the investigation of drug related crimes and the enforcement of federal laws concerning controlled substances as found in Title 21 of the United States Code. Currently, I am assigned to the DEA's Springfield, Illinois, Resident Office (SRO). I have investigated illicit controlled substance trafficking, to include the importation, distribution, manufacture and cultivation of illegal substances. I have personally conducted or

assisted in numerous investigations of state and federal criminal violations involving the illegal trafficking of narcotics and related crimes. I have received specialized training in various aspects of narcotics investigations, which includes but is not limited to interviewing defendants and witnesses, surveillance techniques, and money laundering. Prior to my assignment at SRO, I served for six and a half years with the Cahokia, Illinois, Police Department where I spent four of those years as a detective with their Criminal Investigation Division and held assignments with the Greater St. Louis Major Case Squad and the DEA Hotel/Motel Unit. I served at the DEA Imperial, California, District Office for approximately five years where I worked several multi-agency, multi-jurisdiction poly narcotics investigations and money laundering conspiracy cases. I also served two years at the DEA's Office of Special Intelligence in Washington, DC where I was assigned to a specialized technical unit. I have helped prepare numerous complaint and search warrant affidavits, participated in the execution of search warrants, and testified at criminal trials during my participation in drug investigations.

2.    I am empowered by law to conduct investigations of and to make arrests for the offenses enumerated in Title 18 of the United States Code, as amended, related to money laundering, and the offenses

2

enumerated in Title 21 of the United States Code, as amended, relating to
the possession and distribution of narcotics. As a Drug Enforcement
Administration Special Agent, I am authorized to execute warrants issued
under the authority of the United States.

3.      The statements contained in this affidavit come from my
personal observations, my training and experience, and information
obtained from other agents, law enforcement officers, and witnesses. This
affidavit is intended to show merely that there is sufficient probable cause
for the requested warrant and does not set forth all of my knowledge about
this matter. Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance and in part
only.

4.      I make this affidavit in support of an application under Rule 41
of the Federal Rules of Criminal Procedure for a search warrant authorizing
the examination of property – one electronic device described as a black
colored iPhone, hereinafter referred to as the SUBJECT DEVICE 1 and
one electronic device described as a black colored iPhone, Model A1660,
hereinafter referred to as the SUBJECT DEVICE 2, and more particularly
described in Attachment A – which is currently in law enforcement
possession, and the extraction from that property of electronically stored

3

information described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched is a black colored iPhone, hereinafter referred to as the SUBJECT DEVICE 1, and a black colored iPhone, Model A1660, hereinafter referred to as the SUBJECT DEVICE 2, and is more particularly described in Attachment A hereto. These devices were secured by law enforcement agents on January 28, 2021, from Dartanyon SMITH at the time of SMITH's arrest on a federal criminal complaint. SUBJECT DEVICE 1 and SUBJECT DEVICE 2 are currently located at the Drug Enforcement Administration Non-Drug Evidence Room.

7. The applied for warrant would authorize the forensic examination of SUBJECT DEVICE 1 and SUBJECT DEVICE 2 for the purpose of identifying electronically stored data more particularly described

4

in Attachment B.

8.     This investigation concerns alleged violations of Title 21, United
States Code, Section 841, Distribution of a Controlled Substance and Title
18, United States Code, Section 1956, Money Laundering.

## PROBABLE CAUSE

### *Initiation of Investigation*

9.     In March 2020, DEA Springfield Resident Office (SRO) agents
began investigating a target, being Dartanyon SMITH, for illicit sales of
pharmaceutical controlled substances in the Springfield, Illinois, area.
Springfield Police Department Proactive Crime Unit (PAC) contacted SRO
concerning information obtained from a Springfield Police Department
(SPD) confidential source (CS) regarding SMITH. The CS told SPD
investigators SMITH was selling large amounts of "Xanax" from sources of
supply possibly from the dark web. The CS told SPD investigators the CS
could purchase quantities of "Xanax" from SMITH.

10.    The CS involved in this investigation (hereinafter "CS1") is
financially motivated and has been compensated by law enforcement.
S/he is a proven reliable source of information based on independent
corroboration and has never provided information shown to be untrue or
inaccurate. S/he has provided historical information concerning the

5

suspected "Xanax" distribution operation utilized by Dartanyon SMITH,
including information that SMITH frequently changes the location of
"Xanax" transactions. S/he also indicated s/he has previously purchased
"Xanax" from SMITH.

### *SOI Debrief*

11.    On April 27, 2020, agents met with a source of information
(hereinafter "SOI"). The SOI stated SMITH sells narcotics in the areas of
Ashland, Springfield, and Jacksonville, Illinois. The SOI stated SMITH sells
marijuana, ecstasy, crack cocaine, acid blotters, and pharmaceuticals such
as hydrocodone and alprazolam ("Xanax"). The SOI stated SMITH resides
at 200 West Washington, Ashland, Illinois, in an apartment affixed to a
laundromat in town. The SOI stated SMITH currently drives a 2017 white-
colored Chevrolet Cruze with the Chevrolet insignia painted black.

12.    The SOI stated SMITH acquires most of his narcotics from a
childhood friend, identified as Richard "Ricky" MILLER. The SOI stated
MILLER currently resides in another state, possibly Wisconsin or
Minnesota, and acquires his narcotics through the dark web. The SOI
stated MILLER ships the narcotics to SMITH via FedEx or USPS in blue
and white colored boxes which are labeled for delivery to SMITH's father,
Kevin Westbrook, or SMITH's best friend, Kobe Allen, so that SMITH's

6

name is not on the package and he is not receiving the narcotics at his residence. The SOI stated SMITH pays MILLER either via Facebook Pay or through Cash App. The SOI stated MILLER's packages usually arrive within two or three weeks of order. The SOI also stated SMITH attempted to purchase his own narcotics through the dark web but could not figure out how to complete any transactions so he continues to use MILLER as his supplier.

13.    The SOI stated the most s/he had ever seen SMITH purchase was $1,000 worth of product at a time. The SOI stated SMITH will sell "Xanax" for five dollars a pill and sells crack cocaine to his father, Kevin Westbrook, and his father's girlfriend. The SOI provided SMITH's personal identifying information and SMITH's Snapchat moniker of "bigguccidart", which he uses as his primary means of communication. The SOI stated SMITH also banks at CEFCU and US Bank located on North Grand, Springfield, Illinois. The SOI stated SMITH will deposit whatever money he doesn't spend in one of those bank accounts.

### Seizure of USPS Packages Destined for Dartanyon SMITH

14.    During this investigation, agents placed a GPS tracker on SMITH's vehicle pursuant to a court order. On May 29, 2020, agents observed SMITH's GPS tracker enter Jacksonville, Illinois, which was the

7

first time SMITH had arrived in Jacksonville since the tracker was originally

placed on his vehicle, and observed the tracker data show SMITH stopped

at 342 West State Street in Jacksonville, Illinois and remained there for

several hours.

15.  Agents spoke with Jacksonville PD officers concerning the

address. Agents learned Jacksonville PD had a day prior executed a

search warrant on Katrina WALLACE's residence, which is located at 342

West State Street Apt 7A. Jacksonville PD learned an unknown male

arrived at WALLACE's apartment attempting to purchase

marijuana. WALLACE provided the subject with marijuana in exchange for

an unknown amount of money. The male was upset with WALLACE,

stating he should have received more marijuana for the money he

provided, and an argument ensued between WALLACE and the subject

leading to WALLACE's girlfriend calling 911. Moments after 911 was

called, WALLACE displayed a firearm to the subject and discharged

it. Jacksonville PD arrived and executed a search warrant on WALLACE's

apartment recovering approximately $20,000 U.S.C., approximately 2,000

Xanax bars, a firearm, bank information from Woodforest National Bank,

and an empty USPS envelope which was shipped from Las Vegas,

8

Nevada.

16.  After receiving the information, agents reviewed information
provided by USPIS concerning shipments coming to SMITH from MILLER
and his girlfriend Harley NELSON.  Agents identified several packages
sent to 410 West Reynolds (SMITH's mothers' residence) in Springfield,
Illinois had a postage amount of $26.35, which was also the same postage
amount of three packages previously sent to 342 West State Street, Apt.
7A, Jacksonville, Illinois.

17.  Agents also learned during the course of execution of the
search warrant on WALLACE's apartment that Jacksonville PD
investigators were looking for proof of residency.  A Woodforest National
Bank statement which contained WALLACE's name and account number
had been located, which showed approximately $11,000 deposited and
withdrawn from that account in a recent period of time.  Jacksonville PD
also advised after locating approximately $20,000 inside the apartment and
the aforementioned bank statement, investigators decided to take a look
into the open/empty USPS envelope which had been shipped from Las
Vegas, Nevada and contacted USPIS who located three packages inbound
from Las Vegas to WALLACE's address.  On May 28 and 29, 2020, USPIS
and Jacksonville PD took possession of three packages destined to 342

9

West State Street, Apt 7A, Jacksonville, Illinois.

18.    On May 29, 2020, agents met with Jacksonville PD investigators to view the seized packages. Jacksonville PD investigators had noticed "DART" written in pen over a UPC label on the exterior of two of the three seized packages addressed to WALLACE. Jacksonville PD investigators had begun reviewing WALLACE's financial records and located recent payments from WALLACE's Woodforest National Bank account to NELSON via Cash App. One such payment was made by WALLACE to NELSON on May 5, 2020, in the amount of $3,000. Investigators also stated WALLACE was making incriminating recorded jail calls referencing the packages, how much they cost, whom they belong to and whom is sending them.

19.    On June 2, 2020, USPIS obtained a search warrant for the three packages seized. The three packages had been shipped Priority Mail Express through the USPS by "Ana Allen" at 8215 Shell Beach Ct. Las Vegas, Nevada 89117. The packages were all addressed to Katrina WALLACE at 342 West State St., Apt 7, Jacksonville, IL 62650.

20.    During the course of the search, agents located a handwritten list itemizing what was inside the packages, the cost of the items, and the shipping cost, which brought the total to $5,000. "READ DART" was

10

handwritten on the opposite side of the handwritten list. Agents

unpackaged and seized multiple narcotics to include suspected cannabis,

ecstasy, LSD, cannabis wax, cocaine, and Adderall.

### *Search Warrant of Smith's Phone*

21. On September 9, 2020, at approximately 10:00 a.m., Illinois

State Police (ISP) troopers initiated a traffic stop on a vehicle, identified as

a white-colored Chevrolet Cruze bearing Illinois registration AR18686, and

driven by Dartanyon SMITH while eastbound on Interstate 72 near Exit 91

in Springfield, Illinois. SMITH was observed with his vehicle having

windows at an illegal tint level and a cracked windshield.

22. During the encounter, ISP troopers smelled a distinct odor of

cannabis coming from the vehicle. ISP troopers requested consent from

SMITH to search the vehicle. SMITH provided consent for the search,

which yielded a clear plastic bag containing suspected heroin; a clear

plastic bag containing two blue colored pills, suspected MDMA; and a clear

plastic bag containing approximately ten green colored bars, suspected

alprazolam, two vacuum sealed plastic bags containing jars of suspected

cannabis; a clear plastic bag containing green leafy substance, suspected

cannabis; and one sour patch candy suspected of containing THC.

23. ISP troopers secured SMITH in custody and removed two

11

cellular devices, one from the vehicle and one on or about his person. The devices were secured by ISP and seized as evidence and were later transferred to the custody of DEA.

24.    Search Warrants obtained on both devices showed photographs of illicit narcotics as well as text messages and Snapchat messages showing SMITH communicating narcotics transactions with customers followed with photographs of successful narcotics parcel shipments from SMITH to his customers. The contents also showed SMITH had a second Snapchat account, "lucky7td".

25.    One of the conversations discovered on SMITH's Snapchat account, "lucky7td", was between SMITH and Snapchat Username, "NBA". In the conversation, "NBA" said to SMITH:

"I'm sending you a pack
Tuesday
Acid and xans"

From this conversation, agents identified "NBA" planned to send SMITH acid blotters and alprazolam bars (Xanax) in the mail.

12



A Snapchat user can change his or her "display name" or attach multiple "display names" to a single "username". A "username" or user identification is a fixed identification upon creation and cannot be changed for security reason per Snapchat Support information. Also, the only way to alter a "username" is to delete it (the account) and create a new username/account. After a username is deleted or locked that username will no longer be available to any other user/customer in the future. A "display name" is how a user appears on Snapchat to other

13

users/customers. It is different than the "username" and can be customized however the owner/user desires. In this case, the display name "NBA" was established under the account with username "theboxdon," meaning it was connected to the Snapchat account established by "theboxdon." Agents have identified the User ID/account titled "theboxdon" as utilized by Richard MILLER through subpoenas, search warrants, and sources of information. The above conversation arranging for a drug transaction therefore is reasonably believed to have occurred between SMITH and MILLER using Snapchat.

### *Proffer of Katrina Wallace on November 23, 2020*

26. On November 23, 2020, agents conducted a proffer interview with Katrina WALLACE who had been arrested on charges related to weapons violations and possession with intent to distribute controlled substances. During the proffer, WALLACE advised Richard MILLER had been one of her sources of supply who resided in the Las Vegas, Nevada, area and would ship narcotics to her via the USPS in exchange for payment to MILLER and his girlfriend, NELSON, via Venmo and Cash App.

27. WALLACE also told agents she had brokered an arrangement with MILLER where she would receive similar parcels containing various narcotics and controlled substances for SMITH as well. WALLACE advised

14

MILLER conducted most of his illegal transactions via Snapchat groups and would then transport the narcotics via USPS.

### Traffic Stop on Richard MILLER on January 21, 2021

28.   On January 21, 2021, at approximately 11:00 a.m., agents exchanged batteries on a GPS tracking device affixed to SMITH's vehicle near the Sangamon County Courthouse where it had been located. At approximately 11:45 a.m., agents received a tamper alert from the GPS device advising the GPS tracking device had been removed from the vehicle near St. John's Hospital, which is adjacent to the Sangamon County Courthouse.

29.   On the same date at approximately 1:52 p.m., agents received a similar tamper alert from the GPS device affixed to MILLER's vehicle. Agents, who had been in the vicinity, knew the vehicle to have been parked at 718 North Hilltop in Quincy, Illinois when the tamper alert had been received.

30.   At approximately 3:15 p.m., Illinois State Police Trooper Eply conducted a traffic stop on a black in color 2019 Jeep Cherokee bearing Illinois registration BG38210 and operated by MILLER for failure to signal at the intersection of Hilltop and South 8th Street.

15

31.   During the traffic stop, Quincy Police Department Officer
Russell with K-9 "Diog" had a positive alert from his K-9 partner for the
presence of unknown controlled substances inside the vehicle.  MILLER
was secured in custody and the following items were located inside the
vehicle during a search: several keys for United States Postal Service Post
Office Boxes; an Illinois State driver's license in a fictitious name of "Maria
Smiroldo" with the photograph for MILLER's girlfriend, Harley NELSON;
and a lease agreement in MILLER's name for the address of 400 South 7th
Street Suite D or "4".  A black in color iPhone 12 Pro Max cellular device
was seized from MILLER's person.

### *Residential Search Warrant for 718 North Hilltop, Quincy, Illinois*

32.   On January 21, 2021, a residential search warrant was
executed at 718 North Hilltop in Quincy, Illinois, which is the residence for
MILLER and NELSON.  Agents found a plastic bag filled with mushrooms,
a plastic vacuum bag containing loose white colored pills marked as
oxycodone and blister packs of foreign made alprazolam, two jars of
suspected "cannabis wax", a fraudulent State of Maine identification card in
the name of "Nicholas Guido" with a photograph of MILLER, numerous
shipping labels and packaging materials with the fraudulent name "Nick

16

Guido", and documents and merchandise indicating MILLER's new
Snapchat moniker of "TheSource" used to facilitate sales and distribution of
illicit substances.

33.  Agents obtained cellular telephone toll information on the
cellular device(s) used by NELSON and SMITH from the cellular service
provider(s). In checking toll information supplied by the cellular service
provider(s) on SMITH's devices (SUBJECT DEVICE 1 and SUBJECT
DEVICE 2), they show 36 contacts between SMITH's and NELSON's
cellular devices after MILLER's arrest on January 21, 2021 and before
NELSONS's arrest on January 22, 2021, with 34 being voice
communications (18 showing duration and 16 with no duration) and 2 text
messages.

34.  On January 28, 2021, SMITH was arrested pursuant to an
arrest warrant and criminal complaint issued in the Central District of
Illinois. At the time of his arrest, SMITH was in possession of SUBJECT
DEVICE 1 and SUBJECT DEVICE TWO.

### Specifics Regarding Search of Electronic Devices

35.  Searching SUBJECT DEVICE 1 and SUBJECT DEVICE 2
for the evidence described in the attachment may require a range of data

17

analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

36. Based upon knowledge, training and experience, I know that a thorough search for information stored in storage media often requires

18

agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

   a. The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

   b. The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of

information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of

20

computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

21

## CONCLUSION

38.   Based on the forgoing, I believe Dartanyon SMITH has used electronic devices, i.e. telephones, to conduct the distribution of controlled substances.  I respectfully assert there is probable cause to believe that Dartanyon SMITH and others, known and unknown, are engaged in the distribution of controlled substances and money laundering, and that within SUBJECT DEVICE 1 and SUBJECT DEVICE 2 will be evidence, fruits, and instrumentalities of crimes, namely violations of Title 21, United States Code, Section 841, Distribution of a Controlled Substance and Title 18, United States Code, Section 1956, Money Laundering.

Respectfully submitted,

s/ Todd Emery

Todd M. Emery
Special Agent
Drug Enforcement Administration

Subscribed and sworn to electronically on February 22nd, 2021.

s/ Tom Schanzle-Haskins

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A

### Property to Be Searched

This warrant authorizes the forensic examination of the following property (SUBJECT DEVICE 1 and SUBJECT DEVICE 2), currently located at the Drug Enforcement Administration Non-Drug Evidence Room, for the purpose of identifying the electronically stored information described in Attachment B.

SUBJECT DEVICE 1: A BLACK COLORED IPHONE

SUBJECT DEVICE 2: A BLACK COLORED IPHONE, MODEL A1660

Photographs of the front of the cellular devices, which were recovered from Dartanyon SMITH on January 28, 2021, are included below:



**SUBJECT DEVICE 1**



**SUBJECT DEVICE 2**

2

## ATTACHMENT B

### *Description of Items To Be Seized and Searched*

All records on the property described in Attachment A in whatever
form that relate to constitute or contain evidence, instrumentalities, or fruits
of violations of Title 21, United States Code, Section 841, Distribution of a
Controlled Substance and Title 18, United States Code, Section 1956,
Money Laundering.

1.    All records relating to the violations described above, including:

    a.    any and all documents, records or information[1] relating to
the purchase, sale, importation, possession, shipment, tracking,
delivery or distribution of controlled substances;

    b.    any and all documents, records or information relating to
the purchase, sale, importation, possession, shipment, tracking,
delivery or distribution of packaging materials;

    c.    any and all documents, records or information relating to
the purchase, sale, tracking, delivery or distribution of postage or
express mail consignment;

    d.    any and all documents, records or information relating to

---

[1] As used above and on, the terms "records" and "information" includes all forms of creation or storage, including
any form of computer or electronic storage.

the transfer, purchase, sale or disposition of virtual currency;

e.    any and all documents, records or information relating to the transfer, purchase, sale or disposition of precious metals;

f.    any and all documents, records or information relating to the operation of money transmitting businesses;

g.    any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (Tor-based) services;

h.    any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

i.    any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, and digital manuals.

j.    any and all records relating to an indicia of occupancy, residency, and ownership or use of rental or purchased properties, including, but not limited to, utility and telephone bills; rental, purchase or lease agreements; and identification documents;

k.    any and all records of any address and/ or telephone books, and any records or electronic data reflecting names; addresses; telephone numbers; pager numbers of co-conspirators;

2

sources of controlled substances, precious metals and/ or virtual currency; identifying information for customers purchasing controlled substances; and/ or virtual currency;

l. all bank records, checks, credit card bills, account information, safe deposit box information and other financial records;

m. all copies of income tax returns filed with the Internal Revenue Service (IRS) or the Illinois Department of Revenue.

n. any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

o. any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

p. evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3

q.    evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

r.    evidence of the lack of such malicious software;

s.    evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

t.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

u.    evidence of the times the digital device or other electronic storage media was used;

v.    passwords, encryption keys, and other access devices that may be necessary to access the digital device or other electronic storage media;

w.    contextual information necessary to understand the evidence described in this attachment.

x.    records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

4

search terms that the user entered into any internet search engine, and records of user-typed web addresses.

y.     Any and all hidden services accounts[2] used in furtherance of the offenses described above, including, but not limited to, darknet market accounts, associated darknet forum accounts and Tor-based email accounts.

z.     Any and all peer to peer {P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above, including, but not limited to, localbitcoins.com[3] accounts or bitcon-otc

---

[2] Hidden services (.onion services) are accessed through the Tor anonymity network. Most are considered dark web services with no legitimate or identified service provider to which legal process may be served.

[3] LocalBitcoins, OY (and their associated web platform, localbitcoins.com "LBC") is a Finnish company which is not a licensed money transmitting business registered with the U.S. Government and compliant with the Bank Secrecy Act, which requires establishment and maintenance of anti-money laundering (AML) programs in accordance with know your customer (KYC) rules, such as identifying persons involved in currency transactions over certain thresholds. LBC is not considered a legitimate service provider to which legal process may be served for accurate subscriber information or account seizure.